The opinion of the court was delivered by
Monroe, J.
Plaintiff sues on two promissory notes of $3000 and $6000, respectively, drawn and indorsed by the defendant, and originally secured by mortgage, and prays for a personal judgment for the aggregate amount with interest and costs. .The defense set up is that the plaintifE received the notes from Charles Hernandez as collateral security for a debt which has since been paid, and that, should it appear that plaintifE has any suable interest therein, said notes were acquired from said Hernandez, the original holder, after maturity, and are subject to the following equities, to-wit:—
That- the note for $3000' was issued by defendant to said Hernandez as accommodation paper and without consideration, and was acquired by plaintiff without consideration, and with knowledge of its character. That the note for $6000 was executed as collateral for advances to be made and that defendant is entitled to a credit thereon of $2107.04, and that Hernandez is indebted to plaintifE in the sum of $2000 on account of a draft accepted by him and thereafter protested for non-payment, which amount should, also, be credited on said note.
There was judgment for the plaintiff in the sum of two thousand dollars on the three thousand dollar note, with interest at 5 per cent. from July 29, 1895; and for six thousand dollars on the note for that amount, with interest at 8 per cent, from January 1, 1894, subject to a *1486 credit, however, of $2107.04, as of date March 30th, 1895, and of $2000, as of date December 23, 1895; and from the judgment so rendered, plaintiff has appealed.
The correctness of the judgment on the $3000 note is admitted by the defendant, and is called in question by the plaintiff .only with respect to the rate of interest, which it is claimed, should be 8 per cent. instead of 5 per cent., plaintiff’s counsel referring, in his brief, to the “testimony of the cashier” to the effect that the loan, to secure which the note in question was pledged, bore interest at the higher rate. We have been unable to find this testimony in the record, and do not, therefore, feel authorized to make any change, in this particular, in the judgment appealed from.
The $6000 note, payable to the order of the maker and by him endorsed in blank, first matured in January, 1894. It had been given for advances to be made, and which were made, during the year 1893, and according- to the testimony of the defendant, it was paid in full, at, or about, the date of its maturity. The defendant, continuing his xfianting- operations, however, needed advances for the year 1894, júst as he had needed them for 1893, and his merchant, Hernandez, required security. The note in question had never returned to the hands of its maker and was regarded by. the parties as being available for that purpose, except that it appeared, upon its face, to be past due. There were but two persons concerned in the matter, in fact the maker, himself, is the only party to the note, as Hernandez’s name does not appear on it, so that, unless there is some law to the effect that a man who can make a new negotiable note for $6000 is incapable of converting a past due note for that amount, which he has already made, iiito a live, negotiable instrument, it was competent for the defendant to so deal with the note in question; and he undertook to do so, by writing on the back of it “Payment of this note extended to Jan. 1, ’95”, and signing his name. In this condition, the note remained in the hands of Mr. Hernandez, as security for the advances made by him for the purposes of the defendant’s crop of 1894. The results of the year’s operations were not so fortunate as those of the year before, -and, instead of paying the note in full, showed only a balance of $2107.04 to the credit of the defendant on Hernandez’s books, the entry there, being “Or. on acct. note, $2107.04”, though no such credit was endorsed upon the note itself. In other respects, the situation was the same as it had been in the preced *1487 ing year: — the defendant wanted advances; his merchant required security; the note was considered available,. save that it was past due again, and it was, therefore, extended, by the defendant, who was still the only párty to it, writing on the back “Payment of this note extended to Jan. 1, 1896”, and signing his name. This was done in March, 1895. It was a new contract, for a new consideration, whereby Hernandez agreed to make advances for 1895, and the defendant, in consideration thereof, placed in his possession and under his control, to be used by him, as his own, and as occasion might require, an instrument which bore upon its face all the elements of perfect negotiability save that it appeared to be past due, and which, in that respect, was deliberately amended and changed by the maker, with the consent of the holder, in order that it should no longer be past due, but that it should be a live instrument, with nine months to run, and in order that it might, should occasion require, be used, as such, for the benefit of the maker and holder alike. There is no pretence hero that Hernandez was without authority to pledge the note, and the face of the transaction shows that it was contemplated that he might have occasion to rise it, and that ho should, in such case, use it, as a live, negotiable security, otherwise there would have been no necessity for the extension, since, merely to be held by Hernandez it was as valuable without the extension as with it. Two months later, in May, 1895, Hernandez borrowed $8500 from the plaintiff and pledged the note in question, with other securities, as collateral. How much of the $8500 was advanced by him to the defendant, does not appear. Nor does it appear how the defendant’s account stood at the end of the year 1895, or upon J anuary 1st, 1896, when the note matured. The credit of $2107.04, which is claimed, is the credit which appeared upon Hernandez’s books as the result of the operations of 1894, before the note had been extended and repledged in order to secure the advances to be made during the year 1895.
What amount of money was so advanced in 1895, the record does not disclose. The defendant testifies that Hernandez advanced him “partially” for 1895, and, if this be true and it is also true that he was entitled to a credit of only $2107.04 on the note in question when the season began, it would seem to follow that he is not entitled to the same credit since the advances, partial or otherwise, have been made. The defendant also testifies that, at the date of the institution of ’this suit, *1488 May 1? 1899, Hernandez owed him about $107.04, but as he, practically, admits that he is liable on the note which we are now considering to the extent of nearly two thousand dollars, it is difficult to understand what is meant by that statement. Moreover, in order to bring his liability on said note down to the figure stated, he claims a credit of two thousand dollars, by reason of the fact that, in July, 1895, whilst the note was pledged to plaintiff for all that it called for, he drew a draft on Hernandez, which the latter accepted and thereafter failed to pay; but why he drew the draft does not appear, nor does the evidence show why it was not paid, except in so far as that information is contained in the statement, in the proces verbal of the notary who protested it, that payment was refused, because “the conditions of the acceptance had not been complied with”.
The learned counsel for the defendant stands upon the proposition that after a negotiable note has matured according to its original tenor, it can not be reinvested with the attribute of negotiability by any endorsement which may be placed on it by the maker or other person, and ho relies upon certain cases decided by our predecessors in this court as supporting his position.
It must be admitted that this proposition is so very difficult to reconcile with the elementary principles and definitions applicable to negotiable paper that, in order to sustain it by adjudged cases, there ought to be practical identity between the case under consideration and those relied on.
In the case before us, the note lacked but one thing to bring it within the recognized and admitted rule of perfect negotiability, i. e. it was past due. And it is said that no human power could remedy that defect, and the declaration of the maker himself, written and signed, upon the note itself, to the effect that it should not be considered as past due, but should be held, to all intents and purposes, not to have matured — • a declaration made in his interest, and in order that others should receive the instrument as a live and unmatured security, is of no effect and is not even binding on the man by whom it was made.
Prof. Norton, in a recent work, dealing with the question of “negotiability”, summarizes as follows:
“What words will then be deemed by the courts to confer negotiability? Whether the parties to an instrument can give it a nego- “ fiable character, with all the incidents pertaining to negotiable paper, *1489 “ when it is not, in terms, within the class of instruments known to the “ law as ‘negotiable’ may be questioned,” says Allen, J., in Everton vs. “Bank (66 N. Y. 18). But, however, this may be with instruments “ intended to be otherwise than orders or promises for the payment of “ money alone, still it is probably the rule that, in the instruments gov- “ erned by the law merchant, any words in a bill or note whence it can “ be inferred that the person making it intended it to be negotiable will “ give it- a transferable quality against that person. This is probably the “ better rule, although it was formerly the English rule that, unless a “ bill or note be payable to order or bearer, it was not negotiable. The “ intention of the parties should, and probably would, override the form “ of words, and, if the court can determine, from the words used, that, “ as a matter of fact, it was the intention of both the parties, the one to “ assume the rights of a holder of a negotiable instrument, and the “ other to incur the liabilities of a party thereto, and the instrument, “ in other essential respects contains the elements of a negotiable bill “ or note, the instrument would probably be treated as negotiable, “ though formally incorrect.” Norton on Bills and Notes, pp. 15-16.
The author is here referring to instruments irregular in character, the original language of which leaves it open to question, as to whether, under the law merchant, they could be! considered negotiable; hence his use of the word “probably”.
Tiedman, upon the same subject, says:
“ No exact or particular form of words is necessary in order to give the character of negotiability to commercial paper * * * as it was expressed by the Supreme Court of Pennsylvania, ‘order’ or ‘bearer’, are convenient and expressive, but clearly not the only words which will communicate the quality of negotiability. Some equivalent words should be used. Words in a bill, from which it can be inferred that the person making it intended it to be negotiable, will give it a transferable quality against that person.”
Tiedman on Commercial Paper, 21.
Daniel on Negotiable Instruments, §106.
As to the note under consideration, there can be no sort of question that the language as originally used imparted negotiability, and there can be as little question that it was the intention of the maker, in writing the words “Payment of this note extended to January 1st, 1896”, and signing his name, to give notice that the perfect negotiability *1490 which pertained to the instrument originally was not to be affected by the fact that the date of maturity had passed. This was the deliberate act of the maker of the instrument, and the consequences which resulted are only those which it must be presumed were contemplated by him.
Upon the other hand, the cases to which we are referred by the defendant’s .counsel, were cases in which there was fraud, and in which the indorsements, made after maturity, do not ¿ppear to have been made for the purpose of extending the circulation of the instruments.
In the case of Marcal vs. Melliet, 18th Ann., 225, a mortgage note for fifteen hundred dollars, was extended, by indorsement, after maturity, to a fixed date, was paid shortly afterwards, and was then lost or stolen. The court found that the holder, who sued on it, had not acquired it fairly, and that would seem to have been a sufficient reason for the judgment rejecting his demand. It was also held, that the indorsement, having been made after maturity, did not re-invest the note with unrestricted negotiability. The circumstances of this case, however, indicate that the note was extended by the maker merely to obtain time, and do not indicate that the indorsement, which was somewhat peculiar in its phraseology, was intended to keep the note in circulation.
In Bank vs. Bouny, 42 A. 439, it appeared that Bouny’s clerk, fraudulently and after maturity, pledged, for his own account, a note made by his employer, which the latter had paid and taken up. We find nothing in the facts of this case, as reported, which should make it an authority in the case under consideration.
In Sagory vs. Bank, 42 A. 627, it appeared that the same individual who figured in the Bouny case, held certain notes, belonging- to the plaintiff, of whom he was the agent, that he fraudulently disposed of them for his own account, and that the plaintiff sued to recover them from the bank to which they had been transferred. The facts of this case are not very clearly stated, though it appears that some of the notes involved were extended by indorsement after maturity, and that the court applied the doctrine laid down in Marcal vs. Melliet, and held that, whilst an extension before maturity preserves fhe negotiability of a note, such extension after maturity does not revive such negotiability.
These are the only authorities which have been found, purporting to sustain defendant’s position, and, in view of the wide difference be *1491 tween the facts upon which they rest and those disclosed in the instant ease, we feel constrained to hold that they are 'insufficient for the purpose for which they are cited.
We are satisfied from the evidence in this case, that it was within the contemplation of the defendant, in indorsing upon the note sued on, the extension of its maturity, and in thereupon negotiating it, that it might, and probably would, by reason of such indorsement, be put in circulation as a live, unmatured, negotiable instrument, and that it was his purpose, and the purpose of the merchant to whom he delivered it, that it should be so used if jthe needs of either should require, Under these circumstances, and in view of the fact that the note was put in circulation as the defendant contemplated and intended that it might be, and with the status which it was his purpose to give it, and was acquired, in good faith, for value, without notice, and before the maturity indicated by the extension, by an innocent third person, whose money was thus obtained, we are of opinion that the doctrine, as stated in the cases to which our attention has been called, should not be permitted to control, and that it would be against good conscience to allow the defendant to escape the obvious and intended consequences of his own deliberate acts, and thereby impose a loss upon others, who have acted upon the faith of his representations. Aside from this, the case before us may be differentiated from those relied on by the defendant upon a narrower, but equally' conclusive ground, to-wit:
Going back to the case of Marcal vs. Melliet, it will be found that the extension of the note is dated June 24th, 1863, whereas the note matured, according to its tenor, July 15th, 1862. It was therefore evident, from the instrument itself, that it was extended after maturity, and any one taking it was affected with knowledge of that fact. Conceding, arguendo, then, that where knowledge that a note has been extended after maturity is brought home to the third holder, he may be met by such equitable defences as might have been set up against the original holder, it by no means follows that the same rule should be applied in a ease where it appears that such third holder did not know, and had no means of knowing, whether the payment of the instrument was extended after maturity or before. In the other case cited, it does not appear whether the extension was dated or not. In the instant case, the extension bears no date, though, from the facts disclosed, it *1492 seems evident that, if the defendant and Hernandez had supposed that the availability of the note, 'as collateral security, would thereby have been affected, the extension would have borne a date anterior to the maturity of the instrument, which would have been entirely unobjectionable. As the matter stood, however, the plaintiff was justified in assuming that the extension was indorsed on the note' before its maturity. Speaking of indorsements, generally, Mr. Daniel says: “There is always a presumption, when the payee’s or indorser’s name is indorsed upon a bill or note, that it was done before maturity”. Daniel on Negotiable Insts., Vol. 1, §784.
When an acceptance bears no date, it is presumed to have been made within a reasonable time after the drawing of the bill, and prior to the day of payment. Tiedman on Commercial Paper, p. 220.
We think the rule in regard to presumptions, as thus stated, is particularly applicable in the instant case, where the purpose of the indorsement was to give to the note the status to which the present holder believed it entitled when it received it as security for the loan made to Hernandez.
The suggestion that the fact that no payments of interest were indorsed on the note, when the plaintiff received it, ought to have put the plaintiff on its guard, might be applicable if the interest were payable annually, or otherwise in installments, but such is not the case. The note bears interest from date until paid, and so long as the note was not due the interest was not due, and there was no reason why it should have been paid. Even where interest is payable annually, it has been held that the holder of ‘a note loses no rights against the parties to it by neglecting to demand it, and that he has the election to do so, or wait and collect it all with the principal.
National Bank of North America vs. Kirby, 108 Mass., 497.
The judge a quo allowed interest on the six thousand dollars note (after making the deductions claimed by the plaintiff) at the rate of 8 per cent, per annum, from January 1, 1894, and as the defendant has not appealed or asked any amendment of the judgment, we do not feel authorized to disturb it at his instance. The counsel for plaintiff, however, fixes the date from which the interest on both notes should run, as May 1st, 1899, and asks that it be so decreed, and his request will be complied with.
*1493 It is therefore ordered, adjudged and decreed that the judgment appealed from be reversed, in so far as it allows the defendant credit for $2101.04 and $2000, respectively, on the $6000 note herein sued on, and that plaintiff now have judgment on said note in the sum of $5000, with interest thereon at the rate of 8 per cent, per annum, from May 1, 1899, until paid. It is further ordered, adjudged and decreed that the plaintiff be allowed interest at the rate of 5 per cent, per annum on the $2000 for which it has obtained judgment on the $3000 note sued on, from May 1, 1899, instead of July 29, 1895, and that the judgment appealed from be, in other respects, affirmed, the appellee to pay all costs.
Mr. Justice Breaux concurs in the decree.